**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Javier CONTRERAS–DIAZ,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Bernadette Marie MONTES,
Defendant-Appellant.**

**Nos. 77–3679, 78–1078.**

United States Court of Appeals,
Ninth Circuit.

May 24, 1978.

As Modified Aug. 17, 1978.

Eugene G. Iredale (argued), San Diego, Cal., Helen DeJoice Fortson (argued), Chula Vista, Cal., for defendants-appellants.

Barton C. Sheela, III, Asst. U. S. Atty. (on the brief), Michael H. Walsh, U. S. Atty., Barton C. Sheela, III, Asst. U. S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

Before BARNES and KENNEDY, Circuit Judges, and BARTELS,* District Judge.

BARNES, Senior Circuit Judge:

An indictment was filed against defendants Contreras and Montes on August 24, 1977, charging them in one count with conspiracy to transport illegal aliens by transporting them in an automobile, in violation of 8 U.S.C. § 1324(a)(2) and 18 U.S.C. § 371; in Counts II and III charging defendant Montes with transporting, and Contreras with aiding and abetting the transporting of illegal alien Jose Martinez-Diaz and illegal alien Roberto Castaneda-Rodriguez, respectively. In addition, in Count IV, Contreras was charged with entering the United States illegally in violation of 8 U.S.C. § 1325. The two defendants moved to suppress certain evidence and statements. The suppression motion was heard and denied

---

* Honorable John R. Bartels, Senior District Judge for the Eastern District of New York, sitting by designation.

by Judge Nielsen on September 6, 1977. The court denied the suppression motion as to defendant Montes because of her failure to appear at the time set for the motion hearing (R.T. 7, 45). On September 15, 1977, Montes refiled her motion to suppress (C.T. 46). On October 3, 1977, defendant Contreras waived trial by jury and was tried on stipulated facts. He was found guilty of the conspiracy charged under Count One, and acquitted on the remaining three counts.

On November 7, 1977, Contreras was sentenced to three years in the custody of the Attorney General. Under 18 U.S.C. § 3651, he was ordered to serve the first 6 months in jail with the balance of the sentence suspended and the defendant placed on probation for three years. Notice of appeal was timely filed on Contreras's case on November 14, 1977.

On November 28, 1977, by stipulation filed September 8, 1977, the parties agreed that the testimony adduced at the September 6, 1977, suppression hearing as to Contreras would be considered by the court in ruling on Montes's motion to suppress. The motion was heard and denied by Judge Nielsen (C.T. 25–57, R.T. 56). Montes then waived a jury trial; by stipulation, she was tried on Count One of the indictment only, and convicted. On January 3, 1978, imposition of sentence as to Montes was suspended, and she was placed on supervised probation for a period of 5 years. Counts Two and Three of the indictment were dismissed. She appealed.

This Court has jurisdiction by virtue of 28 U.S.C. § 1291.

Two issues are raised:

1. Whether the detention of defendants by a California Highway Patrol officer was in violation of the Fourth Amendment, where the automobile which defendant Montes was driving and in which defendant Contreras was a passenger was stopped for speeding, and defendants were then detained pending arrival of the Border Patrol agents summoned by the CHP officer?

2. Whether the evidence was sufficient to sustain defendant Contreras's conviction for conspiring to transport illegal aliens?

## I. FACTS

On August 8, 1977, at 10:45 a. m., Officer Pfohl of the California Highway Patrol stopped an automobile for excessive speed on Interstate 15 in the vicinity of Escondido, California. At the point when he made the decision to stop the car, it was traveling at 80 miles per hour and had been making numerous lane changes during the time the officer observed it. When the car stopped on the shoulder of the freeway, its driver, defendant Montes, jumped out of the vehicle and ran back to the patrol car. She stated that there was an emergency, that the mother of the man in the right rear seat was near death in an Escondido hospital, and that the hospital was two freeway exits to the north and right off the freeway. In response to the officer's questioning, she stated that she did not know the name of the hospital (R.T. 7–11, 16).

Officer Pfohl testified that he was "fairly familiar" with the Escondido area, and that there was no such hospital as Montes had described. On cross-examination, Officer Pfohl testified that the Palomar Hospital was approximately 3 miles northeast of the place of the stop; and that if the driver of the vehicle had taken the freeway exit over which her car was stopped, the car would have been heading towards the hospital (R.T. 11, 16–17).

The officer then asked for Ms. Montes's driver's license and vehicle registration. She produced the vehicle registration, an identification card with her photograph, name, and address, and a Pennsylvania birth certificate. She did not have a driver's license (R.T. 11–12). Officer Pfohl then went up to the stopped vehicle and tapped on the window for defendant Contreras to roll down the window, which he did. The officer asked the passenger in the right rear seat if his mother was in the hospital. The individual did not reply but looked at Officer Pfohl "with a dumb-founded look," which indicated to the officer that the man

did not understand English (R.T. 12). Defendant Contreras then spoke up and said that he was the only one of the three men seated in the car who could speak English. The officer asked defendant where they were going, and he answered that they were going to Valley Center to a farm where they worked (R.T. 13).

Officer Pfohl testified under cross-examination that although at first he did not request any identification of defendant Contreras, he went up to the stopped vehicle a second time and requested identification from all the males in the car (R.T. 13, 18–23). Contreras said that he had left his green card at home, and that the other two men in the car didn't have any green cards (R.T. 23). The officer noticed that the two men in the back seat were "very shabbily dressed, not clean-shaven," and that their appearance was "identical" to that of "illegal aliens" with whom he had previously come in contact (R.T. 13–14).

Returning to his patrol vehicle, Officer Pfohl informed Ms. Montes that he was issuing her a citation and that he was going to notify the Border Patrol since none of the subjects in the car had valid identification. She became "very excited" and stated that the Border Patrol had arrested her previously for giving rides to illegal aliens. Pfohl notified the Border Patrol and within five to ten minutes Border Patrol Agent Alan Conroy arrived at the scene. By the time of the agent's arrival, Officer Pfohl had "just finished" issuing a citation for exceeding the speed limit and driving without a driver's license (R.T. 13–15).

After Officer Pfohl briefed Agent Conroy on what the situation was, Conroy went up to the stopped vehicle and asked the three men, in Spanish, where they were born and if they had any papers. They replied that they had no papers and that they were born in Mexico (R.T. 25–27). Conroy went back and asked for Ms. Montes's identification. While he was copying information from her documents, she told him that she had been arrested by the U.S. Border Patrol before. When he had finished writing down the information he needed, Conroy walked back to the parked car and placed defendant Contreras and the other two passengers under arrest (R.T. 30–32).

Both defendants waived jury trial and proceeded on stipulations (R.T. 46–47, 56–58). The stipulations provided that "the evidence on the motion to suppress is not to be considered as evidence as to the guilt or innocence" of the defendants. The stipulations provided that Officer Pfohl would testify to the facts set forth above.

It was also stipulated that Jose Martinez-Diaz, one of the passengers in the back seat of the car, would have testified that he is a citizen of Mexico with no documents or papers entitling him to enter or reside within the United States. He had entered the United States without presenting himself for inspection to any official and had been taken to a house where he stayed until the day he was arrested. At the house he saw defendants Contreras and Montes. Contreras was free to come and go as he pleased, and he told Martinez that "a woman" would give him a ride. On the day of his arrest, Ms. Montes arrived and told Martinez to get into a car. She drove until they were arrested (C.T. 25–26).

Roberto Casteneda-Rodriguez, the third passenger in the back seat of the car, would also have testified that he was a native and citizen of Mexico who had entered and was present in the United States illegally. He was taken to the same house as Martinez, where he met defendant Contreras. Casteneda believed that defendant Contreras, who could leave the house when he wanted, left it at least once to buy food. The stipulated testimony concludes: "I was told by JAVIER [Contreras] that an American woman would take me to the Escondido area. When she arrived on the day of our arrest, I was told by her, in Spanish, to get into the car. I was to sent [sic] $150 to a woman in Tijuana for the trip and JAVIER knew the address where to send the money" (C.T. 26–27).

## II. THE DETENTION OF DEFENDANTS

The defendants concede that *Officer Pfohl had "the absolute right" to stop the*

*vehicle* when he observed it exceeding the maximum speed limit. However, defendants urge that the Fourth Amendment was violated when the officer detained the car's occupants for the five to ten minutes which it took for the Border Patrol agent to arrive in response to Officer Pfohl's call. The defendants assert that after Montes produced the valid identification and vehicle registration, the CHP officer could detain her *only* for the purpose of writing out a citation for speeding and driving without a license; he could not instead go up to the vehicle and attempt to converse with its occupants.

■■■ Assuming *arguendo* that our decision in *United States v. Walling,* 486 F.2d 229, 235 (9th Cir. 1973) is unaffected by the enactment of Federal Rules of Evidence, *see* Fed.R.Evid. 402, and that we must inquire into the legality of the stop and detention both under California law and under the appropriate federal standards, we find nothing improper in the procedures followed by State Officer Pfohl. Both California and the federal courts recognize the validity of brief investigative detentions based on less than probable cause. The California standard requires a "rational suspicion" that "some activity out of the ordinary is or has taken place" which, in some fashion, is connected with the subjects under scrutiny and which, in some manner, suggests that the activity was criminal. *People v. Henze,* 253 Cal.App.2d 986, 988, 61 Cal.Rptr. 545 (1967). The federal standard for testing informal detentions for routine investigation stems from the rule in *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) that:

. . . in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . [I]t is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

This Court has enunciated a "founded suspicion" test stating that there must be "some basis from which the court can determine that the detention was not arbitrary or harassing." *Wilson v. Porter,* 361 F.2d 412, 415 (9th Cir. 1966). In *United States v. Rocha-Lopez,* 527 F.2d 476 (9th Cir. 1976) this finding was held to be indistinguishable from the "reasonable suspicion" test in *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

Defendants rely on *United States v. Luckett,* 484 F.2d 89 (9th Cir. 1973), in which this Court upheld the suppression of evidence obtained by California officers after stopping a person for jaywalking. There the officers detained the jaywalker in order to run a warrant check on him, for the sole reason that he lacked a driver's license! The warrant check revealed that there was an outstanding traffic warrant against the jaywalker, and a search revealed counterfeit U.S. Postal Money Orders in his pocket. This Court stated:

Once the police officers required appellee to come to the police car, he was "seized," and therefore the Fourth Amendment required that the length and scope of the detention be " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This standard permits a police officer to detain an individual stopped for jaywalking only the time necessary to obtain satisfactory identification from the violator and to execute a traffic citation. *Cf. United States v. Hunter,* 471 F.2d 6, 7 (9th Cir. 1972). Here the police had completed both these functions, but they continued to detain appellee for the purpose of running a warrant check. Because they had no reasonable grounds to be suspicious that there might be a warrant outstanding against him, this continued detention was unreasonable, and its fruits, therefore, were properly suppressed by the district court.

*Luckett, supra,* 484 F.2d at 90–91.

On this appeal, unlike the situation in *Luckett, the officer had reasonable grounds*

*for suspicion justifying the brief detention.* Officer Pfohl had stopped a car being driven in excess of the posted speed limit. The driver of the car had told him that they were on their way to an unnamed hospital "right off the freeway" which the officer knew did not exist there. While it is conceivable that Montes was referring to the actual Palomar Hospital three miles east of the freeway, the difference between its location and that described by Montes, the high speed of the car, the frequent lane changes, and the fact that the driver was without a license, all constitute a totality of circumstances sufficient to raise a rational suspicion of possible criminal activity in the officer's mind.[1] At this point Officer Pfohl's detention of Ms. Montes consisted of asking her to wait at the right front fender of his patrol car while he went up to converse with the person in her car who she claimed had a dying mother in the hospital. The length and scope of this brief detention were " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible," *i. e.,* the suspicious story and behavior of Ms. Montes. *Id.*

Once Officer Pfohl questioned defendant Contreras and obtained a completely contradictory story about their destination, he clearly had more reason to be suspicious, and further detention was justified. The appearance of the two back seat passengers and their inability to speak English, their resemblance to illegal aliens with whom Pfohl had previously come in contact, and their lack of valid identification, made it reasonable for the officer to detain the defendants while he contacted the Border Patrol. In any event, the clearly justified detention lasted just long enough for the officer to complete the issuance of the traffic citations to defendant Montes. This case is thus distinguishable from *Luckett* on this basis alone.

In *United States v. Solomon,* 528 F.2d 88 (9th Cir. 1975), this Court upheld the validity of a stop and detention of a vehicle by a CHP officer where the only bases for "rational suspicion" were the facts that the car had driven into a gas station in a small rural desert town, the driver did not know how to unlatch the hood of the car he was driving, and he was unaware of the car's coolant recovery system. *Id.,* 528 F.2d at 90–91.

Clearly, the limited detention of appellants was proper. Officer Pfohl would have been delinquent in his duties as a police officer if he had not done as he did.

## III. SUFFICIENCY OF EVIDENCE

In ruling on Contreras's claim that there was insufficient evidence to convict him of the conspiracy charged, the evidence must be viewed in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Viewed in this manner, the stipulated evidence was sufficient to connect Contreras with a conspiracy to transport illegal aliens. In *United States v. Dunn,* 564 F.2d 348, 357 (9th Cir. 1977), this Court recently stated:

> Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, *even though the connection is slight,* is sufficient to convict him with knowing participation in the conspiracy.

Contreras was present at the "drop house" where the illegal aliens were taken and kept. He left this house to buy food; he knew the address in Tijuana to which Casteneda was to send the $150 that was to pay for his trip north; and Contreras knew that the passengers in the car had no valid identification.

Each of the convictions are AFFIRMED.

---

1. *See United States v. Washington et al.,* 573 F.2d 1317 (9th Cir. decided 1978) after quoting from *United States v. Richards,* 500 F.2d 1025, 1029 (9th Cir. 1974) and cases cited therein:

"Under the totality of the circumstances here, it cannot be said that the detention here was unduly long."