805 A.2d 1086

Corinthious James NATHAN,

v.

STATE of Maryland.

State of Maryland,

v.

Horace Shaw, Jr.

Nos. 42, 61, Sept. Term, 2001.

Court of Appeals of Maryland.

Aug. 29, 2002.

Peter F. Rose and Julia Doyle Bernhardt, Assistant Public Defenders (Stephen E. Harris, Public Defender, on brief) Baltimore, for petitioner.

Kathryn Grill Graeff, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief) Baltimore, for State.

Paul R. Kramer and Granger G. Maher, III (Paul R. Kramer, P.A., on brief) Baltimore, for Respondent/Cross-Petitioner.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA JJ.

RAKER, Judge.

In this case, we again address the constitutional limitations on searches and seizures conducted during the course of a traffic stop. Petitioner Corinthious James Nathan and respondent Horace Shaw, Jr. were convicted of multiple drug possession and importation charges in the Circuit Court for Wicomico County, following the court's denial of their motions to suppress evidence seized as the result of a traffic stop and search of the van that Nathan was driving and in which Shaw was a passenger.

The trial court denied the motions to suppress on the grounds that the scope of the initial investigative detention

was reasonable, that Shaw consented to the search of the van, and that the officer had reasonable and articulable suspicion for the continued detention and investigation of Nathan and Shaw and probable cause for the search of the van's ceiling. Because we agree that the initial traffic stop was valid and that the police had reasonable suspicion for the continued detention of Nathan and Shaw and probable cause for the search of the van's ceiling, we shall hold that the search and seizure of the evidence from the vehicle was lawful.

## I.

On July 14, 1999, at approximately 8:15 p.m., Nathan was driving a 1988 Dodge van owned by Shaw, who was a passenger in the van at the time. Nathan and Shaw were traveling south on U.S. Route 13 near Salisbury, Maryland, where Police Sergeant Mike Lewis and Trooper First Class Robert Penny were parked in an unmarked police cruiser.

While seated in the parked car, Sgt. Lewis heard what he described as the sound of a vehicle traveling at an apparent high rate of speed. Sgt. Lewis and Tfc. Penny pursued the vehicle along the Route 13 bypass, pacing it at approximately seventy miles per hour in a marked sixty-miles-per-hour zone. Sgt. Lewis testified that he observed the vehicle drift across the shoulder of the roadway on two occasions and that he noted that the left brake lamp was out on the van.[1]

Sgt. Lewis activated his emergency equipment and stopped the van. While effecting the stop, Sgt. Lewis noticed that there was a passenger in the rear of the vehicle who raised and lowered his head.

Sgt. Lewis approached the vehicle on the passenger side and asked the driver, Nathan, for his license and registration. The officer testified that, when Nathan lowered the passenger side window, the odor of air freshener coming from the

---

1. Defense counsel presented to the suppression court, as well as this Court, a videotape of the traffic stop, recorded by the camera affixed to Sgt. Lewis' cruiser.

interior of the vehicle was overwhelming. He testified that he observed a conversion ceiling in the roof of the van that appeared to be lower than normal. The blue fabric around the ceiling of the eleven-year-old van appeared to be new and extremely tight, with no evidence of fading or sagging.

Sgt. Lewis observed the passenger in the back of the van, Shaw, lying beneath a couple of light travel bags and a blanket. Sgt. Lewis asked him to move to the front of the van. Sgt. Lewis testified that Shaw acted like he was asleep and that when asked if he had identification, Shaw provided him with the vehicle registration, which was in Shaw's name, and some additional documentation.

Sgt. Lewis asked Nathan to exit the vehicle and to move to the rear of the van. Sgt. Lewis testified that he noticed that Nathan's carotid artery was pounding on both sides of his neck, that his chest was palpitating, and that his hands were trembling. He testified that Nathan would not make eye contact with him and that he was unable to produce a driver's license or other form of identification.

Sgt. Lewis questioned Nathan about the origin of his trip. Nathan first told him that he was coming from New York, then said that he actually was coming from New Jersey. Nathan said that he and Shaw were in New Jersey to pick up the van and that they were taking it back to get the oil checked. Sgt. Lewis testified that Nathan answered many of his questions with questions, which in his experience indicated deception.

Sgt. Lewis then questioned Shaw concerning the origin of his trip. Shaw responded that he and Nathan were coming from New York and that they had driven to New York in a rental vehicle to pick up the van. Sgt. Lewis testified that he noticed Shaw's hands trembling while he was talking to him, his carotid artery pounding, and a nervous twitch above his eye. He asked Shaw if he would consent to a "quick check" of his vehicle for guns and drugs. Shaw agreed and stepped

from the van.[2]   Sgt. Lewis patted Shaw down for weapons.

Sgt. Lewis entered the van on the driver's side.   He hit the ceiling over the driver's seat with his hand and observed that it was solid and hard, with no flexibility.   Sgt. Lewis testified as to his experience with false compartments and their significance to him.   The Court of Special Appeals summarized his testimony as follows:

> "He stated that the fact that the ceiling was solid and had no 'give' at all suggested that it had been reinforced by steel.   Sgt. Lewis testified that, since 1995, he had searched approximately nine to twelve hydraulically controlled false compartments in van ceilings.   Although he found traces of narcotics in all of these compartments, he found a quantity of narcotics only in [Shaw]'s.   He located guns and currency in some cases, and he stated that 'many were empty.'   In Sgt. Lewis' experience, this type of construction is only used for hydraulic compartments, and these compartments are only used for transporting contraband.   Sgt. Lewis believed that no one would have a legitimate reason to have such a reinforced ceiling put in a conversion van.   Thus, once he had knocked on the ceiling of the van, he became quite convinced that there was a compartment."

Sgt. Lewis testified that some of the hidden compartments that he had searched concealed guns and currency, and some were empty, but each one contained traces of narcotics.   He attempted to shift the console and found that he was unable to pull it down.   He testified that he believed that it was affixed permanently with steel plates or rods.

Sgt. Lewis testified that he left the van to get a flashlight to examine the ceiling.   Upon returning, he tried and failed again to move the console.   He left the van again and returned with a screwdriver to attempt to pry open the console.   When he was unable to move the console, he returned to his vehicle and

---

**2.**  Because probable cause and exigent circumstances justified the search of Shaw's vehicle, the validity of the search did not depend upon Shaw's purported consent.   *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983).

called for backup and requested information on the vehicle and its occupants.

Sgt. Lewis went over to Nathan and Shaw to tell them that the tags on the van indicated that it was stolen. He handcuffed Nathan and Shaw and placed them in "investigative detention." Sgt. Lewis admitted that he had no information that the vehicle was stolen and that his only purpose in securing Nathan and Shaw was to prevent a physical confrontation. Once he had placed handcuffs on Nathan and Shaw, Sgt. Lewis told them that he knew that there was a secret compartment in the van and asked them for the code to open it. He advised both men that, if they did not tell him the code, he would have to rip open the ceiling. Nathan and Shaw did not respond, and Sgt. Lewis then tore open the ceiling where he subsequently discovered a secret compartment containing 4.8 kilograms of cocaine and 193 grams of pure heroin wrapped in gray duct-taped packages. At approximately 8:34 p.m., nineteen minutes after stopping the vehicle, Sgt. Lewis placed Nathan and Shaw under arrest, advised them of their *Miranda* rights, and transported them to the Maryland State Police Barracks in Salisbury.

Prior to trial, Nathan and Shaw filed motions to suppress the physical evidence found at the scene of the traffic stop on the grounds that it was seized illegally in violation of the Fourth Amendment and Article 26 of the Maryland Declaration of Rights. The trial court denied their motions to suppress on the grounds that the scope of the initial investigative detention of Nathan and Shaw was reasonable, that Shaw freely and voluntarily consented to the search of the van, and that the officer had reasonable and articulable suspicion for the continued detention of Nathan and Shaw in order to investigate possible criminal activity at the time that Shaw was asked to exit the vehicle and probable cause to believe that weapons and drugs were present in order to search the van's ceiling.

Following separate jury trials, Nathan and Shaw were found guilty of ten counts relating to the importation and

possession of cocaine and heroin. Both men noted appeals to the Court of Special Appeals.

The Court of Special Appeals affirmed Nathan's convictions in an unreported opinion. Judge Ellen Hollander, writing for the panel, found that, by the time the detention had been prolonged beyond the permissible scope of the initial traffic stop, Sgt. Lewis had the requisite reasonable, articulable suspicion necessary to prolong his investigation, in light of his observations and training, which led him to believe that he had detected a hidden compartment that was being used for an illicit purpose. The intermediate appellate court also found, based on the totality of the circumstances, that Sgt. Lewis had probable cause to believe that the roof of the van contained contraband, which rendered his warrantless search of the van lawful.

A different panel of the Court of Special Appeals reached a contrary conclusion and, in an unreported opinion, reversed Shaw's convictions. The intermediate appellate court found that, by the time that Sgt. Lewis began his extensive questioning of Nathan and Shaw regarding their travel plans, his focus had shifted from a traffic stop to a narcotics investigation and that he did not possess the articulable suspicion required for their continued detention. With regard to the search of the van, the court found that Shaw initially had consented voluntarily to the search, but that, by the time Sgt. Lewis had begun to dismantle the ceiling of the van, the consent had "expired" and Sgt. Lewis did not have the necessary probable cause to continue without it.

In dissent, Judge Moylan wrote:

"[O]n the facts of this case based on the evidence before the suppression hearing judge in this case, the discovery of a hydraulically-controlled and reinforced hidden ceiling compartment in the conversion van *ipso facto* generated probable cause to believe that the van may have contained contraband so as to justify a warrantless, and perhaps painstakingly thorough, search of it under *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)."

Although Judge Moylan would find probable cause based on the presence of this "unexplained 'vehicular hidden bank vault,'" he concluded by noting that, when he considered the other factors surrounding this stop in addition to the hidden compartment, his probable cause determination became even stronger.

We granted certiorari in both cases primarily to determine whether the stop and detention of Nathan and Shaw violated the Fourth Amendment and whether the police had reasonable suspicion or probable cause to believe that the occupants of the van were trafficking in guns or drugs. *State v. Shaw*, 365 Md. 266, 778 A.2d 382 (2001); *Nathan v. State*, 364 Md. 534, 774 A.2d 408 (2001). We shall affirm *Nathan* and reverse *Shaw*.

## II.

Nathan and Shaw argue that Sgt. Lewis violated their Fourth Amendment rights by immediately suspending the ostensible traffic stop in favor of an investigatory detention. They argue that the police clearly detained them beyond the permissible scope of a traffic stop. They also argue that the fact that their vehicle was a conversion van, when coupled with other innocuous facts, did not give the police reasonable, articulable suspicion or probable cause to believe that they were trafficking in guns or drugs. Finally, they argue that Shaw's assent to Sgt. Lewis' request to conduct a "real quick check" for guns and drugs did not authorize him to rip open the ceiling of the van.

The State argues that Sgt. Lewis' conduct during the initial traffic stop, including ordering Nathan out of the vehicle and questioning Nathan and Shaw regarding their destination and purpose, was reasonable. The State also argues, based on the totality of the circumstances after the initial conversations with Nathan and Shaw, that Sgt. Lewis had reasonable suspicion to continue the encounter. Finally, the State argues that, once Sgt. Lewis had made an initial inspection of the van's ceiling, he had probable cause to conduct his more thorough

search, and that Shaw's consent to the search of the van was voluntary.

### III.

■ Our review of the Circuit Court's denial of the motion to suppress evidence under the Fourth Amendment is based solely upon the record of the suppression hearing. *See* In re *David S.,* 367 Md. 523, 529, 789 A.2d 607, 610 (2002). In *Wilkes v. State,* 364 Md. 554, 774 A.2d 420 (2001), we reiterated the standard of review of a ruling upon a motion to suppress:

"In our review of the trial court's denial of [a] motion to suppress, we are limited to the record of the suppression hearing. We review the facts found by the trial court in the light most favorable to the prevailing party.... We extend great deference to the fact finding of the suppression court and accept the facts as found by that court unless clearly erroneous. We will review the legal questions *de novo* and based upon the evidence presented at the suppression hearing and the applicable law, we then make our own constitutional appraisal."

*Id.* at 569, 774 A.2d at 429 (internal citations omitted).

■ The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures, including seizures that involve only a brief detention.[3] *See United States v. Arvizu,* 534 U.S. 266, ——, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002); *United States v. Mendenhall,* 446 U.S. 544, 551, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497 (1980); *Ferris v. State,* 355 Md. 356, 369, 735 A.2d 491, 497 (1999). Generally, seizures of persons require probable cause to arrest, and investigative detentions violate the Fourth Amendment in the

---

**3.** The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

absence of probable cause. *See Florida v. Royer,* 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny created a limited exception to the probable cause requirement for investigative detentions, because the balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause in those cases. *See Arvizu,* 534 U.S. at ——, 122 S.Ct. at 750, 151 L.Ed.2d 740; *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). Under *Terry,* certain seizures are justifiable under the Fourth Amendment if there is a reasonable and articulable suspicion that the person is involved in criminal activity. *See Royer,* 460 U.S. at 498, 103 S.Ct. at 1324, 75 L.Ed.2d 229; *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *David S.,* 367 Md. at 532, 789 A.2d at 612; *Quince v. State,* 319 Md. 430, 433, 572 A.2d 1086, 1088 (1990). For Fourth Amendment purposes, a police officer who has reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provoked suspicion. *See Arvizu,* 534 U.S. at ——, 122 S.Ct. at 751, 151 L.Ed.2d 740; *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984).

■ Reasonable suspicion of criminal activity warrants a temporary seizure for questioning limited to the purpose of the stop. *See Royer,* 460 U.S. at 499, 103 S.Ct. at 1325, 75 L.Ed.2d 229; *United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). The determination of whether reasonable suspicion existed is made by looking at the totality of the circumstances in each case to see whether the officer had a particularized and objective basis for suspecting illegal activity. *See Arvizu,* 534 U.S. at ——, ——, 122 S.Ct. at 749, 750, 151 L.Ed.2d 740; *Cortez,* 449 U.S. at 417–18, 101 S.Ct. at 695, 66 L.Ed.2d 621; *Graham v. State,* 325 Md. 398, 408, 601 A.2d 131, 136 (1992).

■ The stop of an automobile and detention of the occupants inside constitute a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention is brief. *See Whren v. United States,* 517 U.S. 806, 809, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996); *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *Wilkes,* 364 Md. at 571, 774 A.2d at 430; *Ferris,* 355 Md. at 369, 735 A.2d at 497. Thus, temporary detentions for traffic violations must not be unreasonable under the circumstances. *See Whren,* 517 U.S. at 810, 116 S.Ct. at 1772, 135 L.Ed.2d 89. In *Ferris,* we said:

"[T]he officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot."

355 Md. at 372, 735 A.2d at 499 (internal citations omitted).

■ In this case, it is undisputed that the initial traffic stop of Nathan and Shaw by the Maryland police for traveling in excess of the posted speed limit was justified. *See Wilkes,* 364 Md. at 572, 774 A.2d at 431. Nathan was speeding on the public highway, and Sgt. Lewis had probable cause to stop the vehicle.

■ With the above principles in mind, we turn to the first question that we must address—that is, whether the officer's conduct during the traffic stop was sufficiently related to the legal basis for the stop, namely the moving violation. *See Ferris,* 355 Md. at 372, 735 A.2d at 499. It is clear that an officer conducting a routine traffic stop may request a driver's

license, vehicle registration, and insurance papers, run a computer check, and issue a citation or a warning. *See Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979); *Wilkes,* 364 Md. at 578, 774 A.2d at 434.[4]

In order for the continued detention of Nathan and Shaw to be permissible, therefore, there had to exist reasonable, articulable suspicion of criminal activity sufficient to justify the seizure, and the limits of a *Terry* stop must not have been exceeded. *See Royer,* 460 U.S. at 498–99, 103 S.Ct. at 1324–25, 75 L.Ed.2d 229; *Ferris,* 355 Md. at 384, 735 A.2d at 506. Under *Ferris,* in order to justify a greater intrusion unrelated to the traffic stop, the totality of the circumstances known to the police officer must establish reasonable suspicion or probable cause to support the intrusion. *See United States v. Johnson,* 63 F.3d 242, 247 (3rd Cir.1995); *Wilkes,* 364 Md. at 574, 774 A.2d at 432; *Ferris,* 355 Md. at 372, 735 A.2d at 499. Absent consent, the officer may only detain the driver and conduct further questioning if, during the traffic stop, the officer acquires an objectively reasonable and articulable suspicion of further illegal activity supported by independent facts sufficient to justify the additional intrusion. *See People v. Redinger,* 906 P.2d 81, 85–86 (Colo.1995); *Caldwell v. State,* 780 A.2d 1037, 1047 (Del.2001); *Ferris,* 355 Md. at 372–73, 735 A.2d at 499; *Commonwealth v. Torres,* 424 Mass. 153, 674 N.E.2d 638, 642 (1997). This involves an objective assessment of the officer's actions in light of the facts and circumstances confronting the officer at the time. *See Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1585, 104 L.Ed.2d 1; *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d 889; *Ferris,* 355 Md. at 384, 735 A.2d at 506; *Derricott v. State,* 327 Md. 582, 588, 611 A.2d 592, 595–96 (1992). Fundamentally, in determining whether the search and seizure of Shaw's automobile was reasonable, our

---

4. A police officer may order a driver and occupants out of a lawfully stopped vehicle incident to a traffic stop. *See Maryland v. Wilson,* 519 U.S. 408, 414–15, 117 S.Ct. 882, 886, 137 L.Ed.2d 41 (1997); *Pennsylvania v. Mimms,* 434 U.S. 106, 109–11, 98 S.Ct. 330, 332–33, 54 L.Ed.2d 331 (1977); *Ferris,* 355 Md. 356, 382 n. 9, 735 A.2d 491, 505 n. 9.

initial inquiry is a dual one—whether Sgt. Lewis' action was justified at its inception and whether it was reasonably related in scope to the circumstances that justified the interference in the first place. *See Terry,* 392 U.S. at 19–20, 88 S.Ct. at 1878–79, 20 L.Ed.2d 889.

Reasonable suspicion is more than a mere hunch but is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 675–76, 145 L.Ed.2d 570 (2000). The United States Supreme Court has most recently discussed the concept of reasonable suspicion in *Arvizu.* Noting that the concept is somewhat abstract and elusive, not finely tuned, the Court has deliberately avoided reducing it to a uniform set of legal rules. *See Arvizu,* 534 U.S. at ——, 122 S.Ct. at 751, 151 L.Ed.2d 740; *Ornelas v. United States,* 517 U.S. 690, 695–96, 116 S.Ct. at 1661, 134 L.Ed.2d 911 (1996). Nonetheless, we do know that reasonable suspicion is a less demanding standard than probable cause. *See David S.,* 367 Md. at 532, 789 A.2d at 612. The Supreme Court has made clear that otherwise innocent behavior may constitute reasonable suspicion when analyzed as part of the totality of the circumstances. *See Sokolow,* 490 U.S. at 9–10, 109 S.Ct. at 1586–87, 104 L.Ed.2d 1; *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983); *Ferris,* 355 Md. at 386, 735 A.2d at 507. In this regard, the Court stated:

"When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably

short of satisfying a preponderance of the evidence standard."

*Arvizu*, 534 U.S. at —— ————, 122 S.Ct. at 750–51, 151 L.Ed.2d 740 (internal citations omitted).

Even though each of a series of acts is innocent standing alone, taken together they can constitute reasonable suspicion. *See id.* at ——, 534 U.S. 266, 122 S.Ct. at 751, 151 L.Ed.2d 740; *Sokolow*, 490 U.S. at 9, 109 S.Ct. at 1586, 104 L.Ed.2d 1. Furthermore, a determination that reasonable suspicion exists need not rule out the possibility of innocent conduct. *See Arvizu*, 534 U.S. at ——, 122 S.Ct. at 753, 151 L.Ed.2d 740; *Wardlow*, 528 U.S. at 125, 120 S.Ct. at 677, 145 L.Ed.2d 570.

In *Arvizu*, the Supreme Court also discussed the application of the totality of the circumstances test to otherwise "innocent" conduct, stating:

"We think that the approach taken by the Court of Appeals here departs sharply from the teachings of these cases. The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase. The court appeared to believe that each observation by [the border patrol agent] that was by itself readily susceptible to an innocent explanation was entitled to 'no weight.' *Terry*, however, precludes this sort of divide-and-conquer analysis. The officer in *Terry* observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another. Although each of the series of acts was 'perhaps innocent in itself,' we held that, taken together, they 'warranted further investigation.' "

534 U.S. at ——, 122 S.Ct. at 751, 151 L.Ed.2d 740 (internal citations omitted). Thus, *Arvizu* makes clear that courts must not view in isolation factors upon which police officers rely to create reasonable suspicion.

The fact that Nathan, the driver, was unable to produce identification, in combination with Sgt. Lewis' obser-

vations of Nathan and Shaw's extreme nervousness,[5] Shaw's apparent pretense of sleep when the vehicle was initially stopped, Nathan's evasive answers regarding his travel plans, the inconsistent versions of the trip itinerary and purpose provided by Nathan and Shaw, the "overwhelming" odor of air freshener, and the altered ceiling that led the officer to believe that the van had a hidden compartment, as well as the police observations prior to the traffic stop (the passenger's head bobbing up and down in the rear window), were sufficient grounds, taken together, reasonably to warrant an investigative detention. *See Royer,* 460 U.S. at 502, 103 S.Ct. at 1326, 75 L.Ed.2d 229; *United States v. Kopp,* 45 F.3d 1450, 1453–54 (10th Cir.1995); *United States v. Springer,* 946 F.2d 1012, 1017 (2nd Cir.1991); *United States v. Hardy,* 855 F.2d 753, 758 (11th Cir.1988). Therefore, Sgt. Lewis had reasonable, articulable suspicion to believe that Nathan and Shaw were engaged in criminal activity, and that suspicion was sufficient to support their continued detention.

■ We turn next to the question of whether the police had grounds to search the van. As we have indicated *supra,* we need not consider whether the police conduct exceeded the scope of Shaw's consent to search because we find that Sgt. Lewis had probable cause to search the vehicle and the hidden compartment. *See supra* note 2 and accompanying text.

■ Police officers who have probable cause to believe that there is contraband or other evidence of criminal activity

---

5. In *Ferris v. State,* 355 Md. 356, 735 A.2d 491 (1999), we cautioned against "placing too much reliance upon a suspect's nervousness when analyzing a determination of reasonable suspicion." *Id.* at 389, 735 A.2d at 509. Nonetheless, we also characterized Ferris's nervousness as being "unexceptional." *Id.* We concluded that "Ferris's unexceptional nervousness, in reaction to encountering Trooper Smith, was simply too ordinary to suggest criminal activity." *Id.* In the instant case, however, Nathan and Shaw's nervousness was characterized by Sgt. Lewis as extreme. As indicated *supra,* the fact that conduct may be innocent does not immunize it from consideration in determining reasonable suspicion. Nonetheless, we reiterate that a claim that ordinary nervousness indicates complicity in criminal activity must be treated with caution. *Id.*

inside an automobile that has been stopped on the road may search it without obtaining a warrant. *See Maryland v. Dyson,* 527 U.S. 465, 466–67, 119 S.Ct. 2013, 2014, 144 L.Ed.2d 442 (1999); *Florida v. Meyers,* 466 U.S. 380, 381, 104 S.Ct. 1852, 1852–53, 80 L.Ed.2d 381 (1984); *Carroll v. United States,* 267 U.S. 132, 153–54, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). If supported by probable cause, every part of a vehicle that may conceal the object of the search may be searched. *See United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982); *United States v. Zucco,* 71 F.3d 188, 192 (5th Cir.1995).

The significance of a vehicle alteration or hidden compartment in a vehicle is an issue of first impression for this Court. Every court that has considered the question has concluded that evidence of a hidden compartment can contribute to a finding of probable cause to search. *See, e.g., United States v. Anderson,* 114 F.3d 1059, 1066 (10th Cir.1997); *United States v. Inocencio,* 40 F.3d 716, 723–24 (5th Cir.1994); *United States v. Martel Martines,* 988 F.2d 855, 858–59 (8th Cir.1993). We need not decide in this case whether a false ceiling or hidden compartment *alone* would constitute probable cause to believe that drugs or contraband are secreted in a vehicle because, in the case *sub judice,* that factor is only one part of the mosaic.

By the time Sgt. Lewis began his extensive search and dismantling of the van's ceiling, he had probable cause to believe that the van contained contraband and, therefore, he was justified in searching it without a warrant under the well-established "automobile exception" enunciated in *Carroll.* 267 U.S. 132, 153–54, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). Considering the totality of the circumstances, we conclude that Sgt. Lewis' observations of the van's ceiling, in combination with Nathan and Shaw's suspicious behavior, were sufficient to constitute probable cause to search the van, including the ceiling. Before Shaw consented to any search, Sgt. Lewis had noticed that the height of the ceiling in the van was lower than normal and that the fabric was new and taut, not as one would normally expect in an eleven-year-old van. The ceiling of the van was solid, hard, with no flexibility, and the map lights

would not move, indicating to the officer that there was a false hydraulic compartment containing contraband similar to one that he found in a conversion van four weeks earlier. Sgt. Lewis testified that the console felt like it was affixed with steel plates and that, in a normal van ceiling, the screws would be removable in the center section to allow for the replacement of bulbs and vents dealing with air conditioning and heating. These factors, taken together, clearly amounted to sufficient probable cause for his search of the van's ceiling.

The facts of the case *sub judice* are strikingly similar to those in *United States v. Anderson*, 114 F.3d 1059 (10th Cir.1997). In that case, a Kansas Highway Patrol officer stopped Anderson's vehicle because he was following the car in front of him too closely. During the course of the traffic stop, the trooper made the following observations: the driver of the car and his passenger gave slightly conflicting versions of their travel itinerary, the trooper detected the scent of air freshener in the car, the driver was carrying a pager, the car's gas tank had been tampered with, and there appeared to be a hidden compartment in the gas tank. The United States Court of Appeals for the Tenth Circuit concluded that those factors together constituted sufficient probable cause to search the car's gas tank. *Id.* at 1066.

*United States v. Inocencio*, 40 F.3d 716 (5th Cir.1994), is likewise instructive. In that case, border patrol agents stopped a pick-up truck exiting a ranch after triggering directional vehicular sensors set up to detect narcotics smugglers attempting to circumvent checkpoints along a major drug smuggling artery. *See id.* at 719–20. When the agents spotted the truck, several factors aroused their suspicions: they were unfamiliar with the vehicle, it had no company logos, tools, or pipe racks typical of oil field trucks, the agents were unaware of any oil activity in the area, and Reyes' (the driver) clothes appeared to be too clean for him to have been working in the oil field. *Id.* at 720. Based on their suspicions, the agents stopped the truck for an immigration inspection. While questioning Reyes, one agent noticed signs of a false compartment in the bed of the truck—the back of the truck

was higher than normal, and there was fresh paint and undercoating around and underneath the bed of the truck. Following a search of the truck, the agents recovered approximately 300 pounds of cocaine from a false compartment in the bed of the truck and, as a result, they arrested Reyes. The Court of Appeals for the Fifth Circuit held that reasonable suspicion for the immigration stop existed. *Id.* at 723. The court also concluded that Reyes' nervousness, conflicting statements explaining his presence on the ranch and his inability to read oil charts and graphs, together with the agents' observations regarding the existence of a false compartment, created sufficient probable cause to search the vehicle. *Id.* at 724.

The United States Court of Appeals for the Eighth Circuit reached a similar conclusion in *United States v. Martel–Martines*, 988 F.2d 855, 858–59 (8th Cir.1993). In that case, police stopped the truck that Martel–Martines was driving for speeding. *Id.* at 856. During the course of the traffic stop, Martel–Martines consented to allow the police to search the truck. *Id.* at 857. While walking around the rear of the truck, the patrol officer observed a custom-cut plywood board covering the length of the truck bed. When he lifted the board, he saw two lines of caulking in the metal bed. Looking underneath the truck with his flashlight, the trooper could observe that the truck bed recently had been reconstructed to support a concealed compartment. The officer had the truck taken to the police headquarters garage where a small hole was made in the hidden compartment, through which the officers could smell chemicals and observe cellophane wrapping around a brown object. At that point, the police arrested Martel Martines, and the police ultimately discovered a large quantity of cocaine during thorough searches of the vehicle. Although the court found that Martel Martines had consented to the search of his truck, the court, assuming *arguendo* that the search exceeded the scope of the consent given, held that, by the time that the officers punched the hole in the truck compartment, they had sufficient probable cause to support a warrantless search of the concealed compartment, based on

Martel–Martines's evasive and inconsistent answers to routine questions and their visual observations of the hidden compartment. *Id.* at 858–59.

For all of the above stated reasons, we find that the search of the vehicle and the seizure of the evidence from within were lawful.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS IN NO. 42 AFFIRMED. COSTS TO BE PAID BY PETITIONER NATHAN. JUDGMENT OF THE COURT OF SPECIAL APPEALS IN NO. 61 REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO CONSIDER REMAINING ISSUES PREVIOUSLY RAISED BUT NOT DECIDED. COSTS IN THIS COURT TO BE PAID BY RESPONDENT SHAW AND COSTS IN THE COURT OF SPECIAL APPEALS TO ABIDE THE RESULT.*

Dissenting Opinion by BELL, Chief Judge, in which ELDRIDGE, Judge. joins.

I agree with the conclusion reached by a divided Court of Special Appeals in its unreported opinion in *Horace Shaw, Jr. v. State,* 139 Md.App. 751 filed June 5, 2001, and most of the rationale offered in the very perceptive majority opinion by Judge Kenney. The opinion proceeded on the premise that, subsequent to the traffic stop, there was a second stop, as *Ferris v. State,* 355 Md. 356, 372, 735 A.2d 491, 499 (1999) recognized there could be and it applied *Ferris,* its progeny, *Charity v. State,* 132 Md.App. 598, 753 A.2d 556, *cert. denied,* 360 Md. 487, 759 A.2d 231 (2000), *Snow v. State,* 84 Md.App. 243, 578 A.2d 816 (1990) and *Whitehead v. State,* 116 Md.App. 497, 698 A.2d 1115, *cert. denied,* 348 Md. 207, 703 A.2d 148 (1997), faithfully and forthrightly.

Acknowledging that the traffic stop was valid, based on the speed of the defendants' van, an equipment defect and the officers' observations of the manner in which the van was driven after it was signaled to pull over, the court analyzed whether, and if so, when, a second stop, based on the shifting of the focus from the traffic violation to a criminal, and more

specifically, a narcotics, violation, occurred. Notwithstanding that Sgt. Lewis, upon approaching the defendants' van, noticed, as the trial court reported, a "lowered ceiling, conversion ceiling in the roof part of the van that appeared to be new fabric, blue, it wasn't faded at all in this eleven-year-old van" and the ceiling "was extremely tight or erect, there was no sagging in the ceiling," an observation likely to arouse Sgt. Lewis's suspicion, given his recent experience with a conversion van he discovered to have a hidden hydraulic compartment in the ceiling directly above the driver and right front seat passenger, it concluded that when the defendants were ordered out of the van, it was done pursuant to the officer's prerogative under *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331, 337 (1977) and *Maryland v. Wilson*, 519 U.S. 408, 411–12, 117 S.Ct. 882, 884–85, 137 L.Ed.2d 41, 46 (1997). Although he might have been operating with a dual motive, the court believed that Sgt. Lewis's questions were proper, "even though they did not appear to have much to do with" whether Nathan had committed traffic violations, and that Sgt. Lewis was "ostensibly obtaining information related to the traffic stop" when he obtained Nathan's particulars. During the course of that interview, due to Nathan's obvious nervousness-according to Sgt. Lewis, his carotid pulse was "pounding in his neck, his chest was palpitating, his hands were trembling" his changing in mid-sentence his answer as to the origin of the trip, the manner in which he answered a question with a question and his refusal to look Sgt. Lewis in the eye, Sgt. Lewis became more suspicious.

It was when the Sergeant left Nathan to question Shaw "for the apparent purpose of catching the men with inconsistent stories" that the focus of the stop shifted, the intermediate appellate court determined. It was during this questioning that Sgt. Lewis's suspicions were further raised as a result of Shaw's behavior and response; Shaw displayed similar nervousness to that displayed by Nathan: Sgt Lewis noticed that Shaw's hands were trembling, there was a nervous twitching just above and behind his right eye and, like Nathan, his

carotid pulse was racing in his neck. Noting that the questions put to Shaw was directed not to the traffic offences, but to the origination and, perhaps, the circumstances, the court determined that the focus of the stop had shifted to the narcotics investigation rather than the traffic stop. It, thus, proceeded to consider whether there was either a valid consent or a reasonable, articulable suspicion of criminal activity to support a further detention of the defendants.

Although the court concluded that the defendants consented to the search of the van, it, nevertheless, addressed whether Sgt. Lewis had reasonable suspicion. It listed the historical facts known to Sgt. Lewis:

"Two African Americans pulled over by two Caucasian, Maryland State troopers are nervous.

"The van contained air fresheners.

"The van, which turned out to be a 1988 model, had some recent work done on the inside such that the ceiling covering seemed new and pulled tight; Sgt. Lewis had found a hydraulic compartment containing a weapon in a conversion van approximately four weeks earlier.

"Both the driver and the passenger had been cooperative and totally compliant with all of his instructions despite initial cause for alarm, including the fact that [Shaw] had been lying down in the back.

"Nathan, who did not own the van and was not related to [Shaw], gave a different story than [Shaw] as to where they were coming from and why they were there.[1]"

It then considered whether any of them or collectively, those factors provided the requisite level of certainty that criminal activity was afoot.

Discounting the air fresheners on the basis of *Charity,* 132 Md.App. at 639, 753 A.2d at 578 ("The air fresheners, although they may have created a hunch, did not create an articulable

---

1. The most significant discrepancy, the court determined, was whether the defendants went to New York in the van or in a rental car.

suspicion") and *Snow*,[2] the nervousness of the defendants on the strength of *Ferris*[3] and *Snow*, 84 Md.App. at 260, 578 A.2d at 824 (nervousness is a "highly subjective observation") and the inconsistent stories with *Whitehead*, 116 Md.App. at 504, 698 A.2d at 1119 ("There is nothing about not having their stories together, about just whom they visited, or about the day that they left Baltimore, that somehow yields an inference of possession of narcotics. Or, put another way, there is nothing about narcotics laws violators that police can recognize from an inability to agree upon these details of their journey to New Jersey."), the court held:

"These factors may certainly have given rise to a "hunch" on Sgt. Lewis's part, but we do not believe they add up to articulable suspicion in light of *Ferris* and *Charity*. We note further that, at this point, Sgt. Lewis had not radioed in any information to his dispatch to determine the status of the van or its occupants, and he also saw or smelled nothing

---

2. In *Snow v. State*, 84 Md.App. 243, 261, 578 A.2d 816, 824 (1990), the Court of Special Appeals observed, as to air fresheners:

"Air fresheners are, as far as we know, a completely legitimate object; some are, undoubtedly, thought to be ornamental as well as functional. Nor is it the fact that Snow had three air fresheners, as opposed to one, suspicious. The addition of a new freshener without removing the old one is not unusual. As with other cleaning products, when the consumer is uncertain regarding the useful life of a product, the tendency is to keep the old one for a while longer.

3. We were emphatic in *Ferris v. State*, 355 Md. 356, 388, 735 A.2d 491, 508 (1999):

"The nervousness, or lack of it, of the driver pulled over by a Maryland State trooper is not sufficient to form the basis of police suspicion that the driver is engaged in the illegal transportation of drugs. There is no earthly way that a police officer can distinguish the nervousness of an ordinary citizen under such circumstances from the nervousness of a criminal who traffics in narcotics. An individual's physiological reaction to a proposed intrusion into his or her privacy cannot establish probable cause or even grounds to suspect. Permitting citizen's nervousness to be the basis for a finding of probable cause would confer upon the police a degree of discretion not grounded in police expertise, and, moreover, would be totally insusceptible to judicial review." (Quoting *Whitehead v. State*, 116 Md.App. 497, 698 A.2d 1115, cert. denied, 348 Md. 207, 703 A.2d 148 (1997))..

other than air freshener that would lead him to believe that the van contained contraband."

Although "[h]e never conducted a thorough search of the interior of the van, did not look under the seats, in the bags [Shaw] and Nathan had in the back of the van, or in the glove box or other containers," and never checked for weapons, despite an earlier profession of concern arising from Shaw's movements in the back of the van, the court observed that Sgt. Lewis entered the van five times in an effort to locate, open and search the hidden compartment he was convinced was there. Based on his earlier experience with a conversion van containing a hydraulic ceiling compartment, the court further pointed out, his focus was on the front part of the van, where the map lights are located. Quoting Sgt. Lewis, it described the first entry: having hit the ceiling twice and checked the two map lights for functionality and finding them to both be working, he tried to pry down that area, where the entrance to the compartment in the earlier van was located, without success; "[a]t that point in time I couldn't budge it, it wouldn't even pull down at all, it wouldn't budge, it was like it was permanently affixed with steel plates or steel rods."

The second entry was with a flashlight, "to further inspect the area." When he still could not gain entry, Sgt. Lewis obtained a screwdriver, which he concealed from the defendants, for assistance. Even with that assistance, he failed to gain entry to any hidden compartment. The intermediate appellate court concluded, as to these search efforts:

"We believe that all of these actions were acceptable, although Sgt. Lewis walked on the line of what a reasonable person would find acceptable pursuant to a consent to search when he tried to pry the ceiling compartment open." (footnote omitted).

After reviewing the testimony of Sgt. Lewis at the suppression hearing, the Court of Special Appeals concluded that he was convinced that there was a hidden compartment once he knocked on the ceiling of the van. To the court, it was significant that, after the third entry and attempt to find and

search the compartment, Sgt. Lewis stopped and "advised [Shaw] and Nathan that he was going to get them 'right out of here' and that he was going to radio in that everyone was 'all right,'" and did, in fact, call the dispatcher, but, rather than wait for a response as to whether there were any outstanding warrants, he told the defendants that the van was reported stolen, which he knew to be false. It was also significant that, after handcuffing them, Sgt. Lewis acknowledged that the van had not been reported stolen, advised them for the first time of his belief that the van had a false hydraulically controlled compartment in the ceiling and demanded that they provide him with the location. When neither defendant cooperated, indeed indicated that they did not know about what he was talking, Sgt. Lewis "stated multiple times that he would tear into the ceiling of the van even though he did not want to do so."

Observing that, when he began to pry open the compartment, he was "looking for narcotics more so than other contraband," the Court of Special Appeals opined that, "[t]o the extent that [Shaw] had previously consented to a search of his van, ... that consent had expired by this point." Moreover, it rejected the State's argument that the consent continued because neither man instructed Sgt. Lewis to stop or in any way objected:

"Prior to radioing in to dispatch, Sgt. Lewis had indicated to appellant and Nathan that he would have them on their way shortly, which, no doubt, any reasonable person would interpret as a sign that the search was over. Moreover, to the extent that Sgt. Lewis was asking for consent to rip into the ceiling of the van, such consent was hardly voluntary in view of the fact that he was threatening to do so anyway and both men were in handcuffs."

(Citing *Doering v. State,* 313 Md. 384, 401–02, 545 A.2d 1281, 1289 (1988)).

Turning to the question of whether, at that time, Sgt. Lewis had probable cause to believe that the van contained contraband, the court answered, "no." Its reasoning is clear and

logical. Reviewing the definition of probable cause, as explicated in *Dixon v. State*, 133 Md.App. 654, 678, 758 A.2d 1063, 1076 (2000), "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see State v. Lee*, 330 Md. 320, 326, 624 A.2d 492 (1993), i.e., a nontechnical conception of a reasonable ground for belief of guilt and recognizing, as *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) teaches, that:

"The principal components of a determination of probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to ... probable cause,"

the court enumerated the historical facts in the case up to the point of the expiration of the consent, with an eye toward determining whether they amounted to probable cause. In addition to those historical facts already identified, they were determined to be:

\*       \*       \*       \*       \*       \*

"The two men were driving a van with out of state license plates down Route 13.

\*       \*       \*       \*       \*       \*

"Sgt. Lewis found that the ceiling of the van was hard.

"There was a television mounted into a panel extending perpendicular to the ceiling, a Sony Playstation mounted in that same panel, and a VCR or other component mounted underneath the panel.

"Sgt. Lewis was unable to find any openings or wires suggesting the presence of a hydraulic compartment, nor was he able to pry open the panel containing the map lights, the site of a hydraulic container in [a] van detained previously.

"There were containers in the car, such as bags, but Sgt. Lewis did not look inside them."

Then viewing the facts from the point of view of a reasonable police officer, as it was required to do, *see Ornelas,* 517 U.S. at 700, 116 S.Ct. at 1664, 134 L.Ed.2d at 921, the intermediate appellate court opined:

"[T]he majority of the factors listed above do not rise to the level of probable cause. For example, air fresheners, only two of which were in the front of the van, are not indicative of criminal behavior, nor is nervousness. Suspicions might be aroused by the two men's differing stories as to how they got to New York. but this gives rise to generalized suspicion rather than objective proof of wrongdoing. This leaves us with some generalized suspicion along with a hard ceiling in the van. Sgt. Lewis certainly provided expert testimony regarding the uses of hydraulically controlled compartments in conversion vans, yet we must look at this from the point of view of an objectively reasonable police officer with training and experience in narcotics trafficking."

The court discounted the cases from other jurisdictions involving searches of hidden compartments, noting "[i]n virtually all cases, there was something more than was present in this case." It concluded:

"An objectively reasonable police officer might have suspected that the van contained a hidden compartment, but, other than the fact that the ceiling was hard, there was nothing else, i.e., wires or an obvious opening, that would indicate the presence of a compartment. We do not believe that, in this case, the generalized suspicion tips the scale into the realm of probable cause. Both men were extremely cooperative and nothing was present to indicate the presence of contraband."

On the basis of this opinion, therefore, I would affirm the judgment in *Shaw* and reverse the judgment in the companion case, *Nathan,* in which another panel of the intermediate appellate court reached the opposite result.

To the majority, sufficient grounds to justify an investigative detention have been established by the following facts, taken together:

"that Nathan, the driver, was unable to produce identification, in combination with Sgt. Lewis's observations of Nathan and Shaw's extreme nervousness,[4] Shaw's apparent pretense of sleep when the vehicle was initially stopped, Nathan's evasive answers regarding his travel plans, the inconsistent versions of the trip itinerary and purpose provided by Nathan and Shaw, the "overwhelming" odor of air fresheners, and the altered ceiling that led the officer to believe that the van had a hidden compartment, as well as the police observations prior to the traffic stop (the passenger's head bobbing up and down in the rear window),"

At 665 leading to the conclusion that "Sgt. Lewis had reasonable, articulable suspicion to believe that Nathan and Shaw were engaged in criminal activity, and that suspicion was sufficient to support their continued detention." Id. at 665. The majority also holds that Sgt. Lewis had probable cause to search the van, reasoning:

"Considering the totality of the circumstances, we conclude that Sgt. Lewis's observations of the van's ceiling, in combination with Nathan and Shaw's suspicious behavior, were sufficient to constitute probable cause to search the van, including the ceiling. Before Shaw consented to any search, Sgt. Lewis had noticed that the height of the ceiling in the van was lower than normal and that the fabric was new and taut, not as one would normally expect in an eleven-year-old van. The ceiling of the van was solid, hard, with no flexibility, and the map lights would not move, indicating to

---

4. In *Ferris v. State*, 355 Md. 356, 735 A.2d 491 (1999), we cautioned against "placing too much reliance upon a suspect's nervousness when analyzing a determination of reasonable suspicion." *Id.* at 389, 735 A.2d at 509. Nonetheless, we also characterized Ferris's nervousness as being "unexceptional." *Id.* We concluded that "Ferris's unexceptional nervousness, in reaction to encountering Trooper smith, was simply too ordinary to suggest criminal activity." *Id.* In the instant case, however, Nathan and Shaw's nervousness was characterized by Sgt. Lewis as extreme. As indicated *supra*, the fact that conduct may be innocent does not immunize it from consideration in determining reasonable suspicion. Nonetheless, we reiterate that a claim that ordinary nervousness indicates complicity in criminal activity must be treated with caution. *Id.*

the officer that there was a false hydraulic compartment containing contraband similar to one that he found in a conversion van four weeks earlier. Sgt. Lewis testified that the console felt like it was affixed with steel plates and that, in a normal van ceiling, the screws would be removable in the center section to allow for the replacement of bulbs and vents dealing with air conditioning and heating. These factors, taken together, clearly amounted to sufficient probable cause for his search of the van's ceiling."

Id. at 666.

In reaching the latter conclusion, the majority focuses heavily on Sgt. Lewis's observations of the van's ceiling, the conclusions he drew from those observations and his having discovered a false hydraulic compartment in a conversion van similar to Shaw's four weeks earlier. It finds support for that focus in three cases involving hidden compartments, *United States v. Anderson,* 114 F.3d 1059, 1066 (10th Cir.1997); *United States v. Inocencio,* 40 F.3d 716, 723–24 (5th Cir.1994); *United States v. Martel Martines,* 988 F.2d 855, 858–59 (8th Cir.1993). The "suspicious behavior" to which the majority refers relates back, I surmise, to the "grounds" found sufficient to justify the defendants' continued detention.

I am disturbed by the majority's holding that the facts that the defendants were nervous and gave inconsistent versions of the trip's itinerary and purpose and that air fresheners were present in the van are significant indicia of the existence of probable cause. As we have seen, the appellate courts of this state have previously considered each of these factors and determined that they are slender reeds on which to base reasonable suspicion, not to mention probable cause.

In *Ferris,* this Court, as the majority itself acknowledges, cautioned against "placing too much reliance upon a suspect's nervousness when analyzing a determination of reasonable suspicion." *Id.* at 389, 735 A.2d at 509. It cited a number of cases from other courts to that effect. *United States v. Wood,* 106 F.3d 942, 948 (10th Cir.1997); *Gonzalez–Rivera v. Immigration & Naturalization Service,* 22 F.3d 1441, 1447 (9th

Cir.1994); *Buffkins v. City of Omaha*, 922 F.2d 465, 470 n. 13 (8th Cir.1990); *United States v. Andrews*, 600 F.2d 563, 566 (6th Cir.1979), *cert. denied sub nom. Brooks v. United States*, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979); *State v. Washington*, 623 So.2d 392, 398–99 (Ala.Crim.App.1993); *State v. Magner*, 191 Ariz. 392, 956 P.2d 519, 524 (Ct.App.1998); *State v. DeMarco*, 263 Kan. 727, 952 P.2d 1276, 1283–84 (1998); *State v. Mendoza*, 748 P.2d 181, 184 (Utah 1987). We pointed out that characterizing an individual as nervous, even unusually so, "is an extremely subjective evaluation." *Ferris*, 355 Md. at 389, 735 A.2d 491, *citing United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir.1994). That is especially the case when the officer has had no prior interaction with the person whose behavior is being characterized; under those circumstances, we noted, the officer "could not reasonably gauge [the person's] behavior during the traffic stop with his usual demeanor." *Id.* citing, for that proposition, *United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir.1998).

To be sure, we characterized the "nervousness" in *Ferris* as being "unexceptional," and, therefore, "simply too ordinary to suggest criminal activity." *Ferris*, 355 Md. at 389, 735 A.2d at 509 On the other hand, citing *Whitehead*, 116 Md.App. at 505, 698 A.2d at 1119, with approval, we acknowledged:

> "Permitting a citizen's nervousness to be the basis for a finding of probable cause would confer upon the police a degree of discretion not grounded in police expertise, and, moreover, would be totally insusceptible to judicial review."

In the instant case, the majority finds solace in the fact that Nathan and Shaw's nervousness was characterized by Sgt. Lewis as extreme. Unfortunately, it does not provide a basis for differentiating between "ordinary nervousness," which still must be treated with caution and extreme nervousness, which does not and cannot be the basis for probable cause, except by reference to the police officer's characterization. The majority, thus, seems to be ceding the determination of the level of nervousness of a driver to the police, whom it has already decided, because of lack of prior experience and expertise, as well as the unreviewability of any conclusion thereby made,

are ill-equipped to do so. Moreover, this analysis undermines the very forceful statement in *Ferris*, providing the road map for getting around its proscription: simply characterize the nervousness as extreme. This is particularly distressing because that is precisely what the characterization will be in each succeeding case, every police officer will become quite aware, and quite adept at discerning palpitations, of the carotid pulse. In *Ferris*, we accepted the admonition of the court in *United States v. Millan Diaz*, 975 F.2d 720, (10th Cir.1992), against according too much weight to the State's routine claim that garden variety nervousness accurately indicates complicity in criminal activity: "This repetitive assertion by the Government in all cases of this kind must be treated with caution." *United States v. Millan–Diaz*, 975 F.2d at 722. 355 Md. at 389, 735 A.2d at 508–09. No less caution should be shown when the routine claim is of extreme nervousness.

The Court of Special Appeals, in *Whitehead*, addressed the effect on the probable cause calculus of two or more persons giving inconsistent stories with regard to the trip's destination, purpose or origin during a traffic stop. It held that an inability to agree upon these details does not establish probable cause. 116 Md.App. at 504, 698 A.2d at 1119. The same conclusion was reached as to air fresheners in *Charity;* a hunch the presence of such fresheners may provide, but certainly not probable or even reasonable suspicion. In *Charity*, it also must be remembered, there were 72 air fresheners on the rear view mirror. In this case, there were but four, two in the front of the van and two in the rear. It is also interesting that the characterization of this effect, by the same officer, by the way, was the same—overwhelming.

Whether the driver of the van produced a driver's license adds little, if anything to the inquiry. To be sure, Maryland Code (1977, 1998 Repl.Vol.) § 16–112(c) of the Transportation Article requires every driver to have his or her driver's license with him or her and to display it on demand to any uniformed police officer. Failure to have a license in possession and, thus, to display it, is a misdemeanor punishable only by a fine. *See* Md.Code (1977, 1998 Repl.Vol.) § 27–101(a) and (b) of the

Transportation Article. This is to be contrasted with the requirement that every driver be licensed. *See* Md.Code (1977, 1998 Repl.Vol.) § 16–101 of the Transportation Article. No serious effort was made by Sgt. Lewis to determine which it was, driving without license in possession or driving without a license. Nor does the driver's evasiveness appreciably advance the inquiry. In fact, it would seem to fall squarely within the ambit of the rule with respect to conflicting stories. Shaw's pretense of sleep when Sgt. Lewis initially approached the van and the observations of the police prior to the traffic stop (the passenger's head bobbing up and down in the rear window) may have had relevance early on, but it was dissipated by subsequent events—both defendants were very cooperative and it was not deemed necessary by Sgt. Lewis to even search the area of the van where Shaw first was seen.

This leaves for consideration only Sgt. Lewis's observations of the van's ceiling. At the outset, I am offended by the suggestion that customization of, or an alteration to, a 1988 conversion van, or any older model vehicle, for that matter, provides a basis for reasonable suspicion to justify a further detention or probable cause to support a search. As far as I know, there is no law against, and indeed no sound basis for discouraging, the owner of such a vehicle from customizing it, repairing it and/or improving it, as an option to purchasing a new one. But the rule that the majority formulates, because it potentially subjects to search all conversion vans so altered and perhaps all vehicles that have been customized and altered from factory specifications, would burden the decision to customize and alter and, thus, discourage its being done.

Nor does the inspection of the van's ceiling justify the conclusion that there was reasonable suspicion for detention or probable cause to search. This is true notwithstanding that Sgt. Lewis had an experience several weeks before which resulted in his discovery in a conversion van of a hydraulically operated compartment. Neither this experience,[5] nor Sgt.

---

5. Indubitably, the hidden compartment found in the conversion van several weeks earlier was not a prototype for the hidden compartment

Lewis's asserted extensive training and experience in drug interdiction [6] suffices to establish, with the requisite degree of certainty, without empirical data to support it, that this conversion van, or any other, has a hidden compartment and, if so, that those compartments are frequently used to conceal contraband. Certainly, the likelihood that hidden compartments in conversion vans will frequently or almost always be used to conceal contraband is a matter of statistical fact, which is subject to proof. The anecdotal testimony of Sgt. Lewis simply does not suffice as such proof. Indeed, as Nathan reminds us:

"It cannot fairly be disputed that automobiles are endlessly accessorized and customized in perfectly innocent ways. To say that the fact that a vehicle has had some customized improvement satisfies the requirement that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,' would ... place all manner of innocent drivers at risk for unwarranted governmental intrusion. *See Ferris v. State*, 355 Md. at 386, 735 A.2d 491

---

in this conversion van, as the location of its entrance was different than the location of the entrance to this one, a fact that Sgt. Lewis discovered after taking claw hammer to ceiling in the area where he located the other compartment and finding nothing.

6. Sgt. Lewis's testimony that other conversion vans had hidden compartments, in his experience, and were used to conceal contraband is not probative. Relevant in this regard is the proffer made at the suppression hearing to the effect that "there is nothing unusual about an older van being converted. It's much cheaper to spend five or six thousand dollars in putting in all this equipment than spending forty or fifty thousand for a new van. And it's done all the time. And one person even said that by safety regulations they have to reinforce the ceiling above the driver when they put in TV's, et cetera, into such vans. And that it would be nothing unusual about this particular van."
Also, As Nathan points out, Sgt. Lewis testified that in fifteen years, he had personally search nine to twelve compartments of the type in this conversion van and in only one of them was any quantity of contraband discovered. In any event, that Sgt. Lewis has seen other hidden compartments in which contraband was concealed is far from dispositive of probable cause. The police regularly find contraband in various parts of vehicles and, yet, those prior discoveries do not provide probable cause to search the next car or another vehicle in the location where the contraband was found.

('factual circumstances which "describe a very large category of innocent travelers" cannot in of themselves justify a seizure.' (Quoting *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890, 894 (1980))"

The majority's assertion that *Anderson, Inocencio* and *Martel–Martines* support the result in this case is not persuasive. Anderson is similar to the case, *sub judice*, insofar as three of the factors relied upon for probable cause, the smell of air fresheners, conflicting stories about the travel itinerary, the existence of a hidden compartment, are concerned. Two of them, the former two, do not suffice in Maryland to establish either reasonable suspicion or probable cause. As to the hidden compartment, there is a significant difference between coming upon such a compartment inadvertently and surmising that there must be one simply because work has been done on an older vehicle and because the officer recently has come across a vehicle with one. Moreover, there is a significant difference between a hidden compartment in a gas tank and one suspected of being in the ceiling of a van, based only on the fact that the older van was improved.

*Inocencio* involved a roving Border Patrol stop and, so, is subject to a different analysis, that is guided by the principles enunciated by the United States Supreme Court in *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). 40 F.3d at 722. Those principles permit Border Patrol officers on roving patrol to detain vehicles temporarily for investigation when they are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the vehicle is involved in illegal activities. *Id.* citing *United States v. Cardona*, 955 F.2d 976, 980 (5th Cir.), *cert. denied*, 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 291 (1992) (quoting *Brignoni Ponce*, 422 U.S. at 884, 95 S.Ct. at 2581–82, 45 L.Ed.2d at 618) and noting that *United States v. Cortez*, 449 U.S. 411, 421–22, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) expanded the *Brignoni–Ponce* "reasonable suspicion" test for alien smuggling to encompass vehicle stops for any suspected criminal activity.

Factors have been developed to assess whether a Border Patrol agent has acted with reasonable suspicion:

"(1) known characteristics of a particular area, (2) previous experience of the arresting agents with criminal activity, (3) proximity of the area to the border, (4) usual traffic patterns of that road, (5) information about recent illegal trafficking in aliens or narcotics in the area, (6) the behavior of the vehicle's driver, (7) the appearance of the vehicle, and (8) the number, appearance and behavior of the passengers."

*Id.*, citing *United States v. Casteneda*, 951 F.2d 44, 47 (5th Cir.1992) (citing *United States v. Melendez–Gonzalez*, 727 F.2d 407, 411 (5th Cir.1984) (in turn citing *Brignoni–Ponce*, 422 U.S. at 885, 95 S.Ct. 2574)). Notwithstanding the absence of the proximity factor, the court in *Reyes* determined that *Brignoni–Ponce* applied, nonetheless, and that "[a] careful examination of the facts creates a reasonable suspicion of illegal activity," including several of the *Brignoni–Ponce* factors, *Inocencio*, 40 F.3d at 723, as follows:

"The agents testified at trial that Reyes [the driver] appeared nervous and offered conflicting statements in explaining his presence on Helen Ranch Road. In addition, they testified that Reyes was unable to read certain graphs and charts that he claimed he was working on while in the area [and] that the bed of the vehicle was higher than normal, the discovery of fresh paint (on a brand new truck) around the fender wells and the fresh undercoating beneath the bed of the truck."

*Id.* at 723–24. The court concluded that the cumulation of these factors amounted to probable cause. Thus, given the context, there was a good deal more in that case than in this one.

The result in *Martel–Martines* is governed by the consent to search that the defendant gave in that case. The analysis based on a lack of valid consent is pure dicta.

There was a time in America when a person with an older van or car could alter or improve that vehicle, whether to save money or to make it more comfortable or attractive or simply

because he or she felt like doing so, by accessorizing and/or customizing it, and drive it on any interstate highway, even one patrolled by police whose major focus is drug interdiction, without fear of the improvement being the cause for suspicion of wrong-doing [7] and, thus, the basis for him or her being subjected to the intrusiveness of a search of that vehicle. After today, I fear that time is no more. Any alteration to an older vehicle that a police officer, experienced in drug interdiction, says may contain a hidden compartment will suffice, so long as he or she also characterizes the occupants, or, I suspect, at least one of them, as extremely nervous and the van has air fresheners, the odor from which, the officer says, is overwhelming and, perhaps, there is not 100 percent identity in the reporting of the itinerary.

Moreover, the record does not demonstrate that Trooper Smith had any. Furthermore, the statement that an individual appeared unusually nervous is an extremely subjective evaluation. *United States v. Fernandez,* 18 F.3d 874, 879 (10th Cir.1994).

I emphatically dissent.

Judge ELDRIDGE joins in the views expressed herein.

---

**7.** Lest it be forgotten, Sgt. Lewis focused on the newness of the ceiling and its incongruity with the age of the van from the very moment that he approached the van. As reported by the majority opinion:

"The officer testified that, when Nathan lowered the passenger side window, the odor of air freshener coming from the interior of the vehicle was overwhelming. He testified that he observed a conversion ceiling in the roof of the van that appeared to be lower than normal. The blue fabric around the ceiling of the eleven-year-old van appeared to be new and extremely tight, with no evidence of fading or sagging."
[At 653].